KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Matthew J. Williams, Esq. (MW 4081)
Jonathan T. Koevary, Esq. (JK 5730)

Attorneys for Ideasphere, Inc. and TL Acquisition Corp.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | CHAPTER 11 |
| **TL ADMINISTRATION CORPORATION et al.** (f/k/a/ **TWINLAB CORPORATION et al.**), | |
| | Case No. 03-15564 (RDD) |
| Debtors. | |
| **TL ADMINISTRATION CORPORATION et al.** (f/k/a/ **TWINLAB CORPORATION et al.**), | Adv. No. 05-02376 (RDD) |
| Plaintiffs, | |
| - v. - | |
| **IDEASPHERE INC.,** AND **TL ACQUISITION CORP.** | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Ideasphere, Inc. and TL Acquisition Corp. (collectively

"Defendants"), by their attorneys, Kramer Levin Naftalis & Frankel LLP, submit this

memorandum of law in support of their motion (the "Motion"), pursuant to Rule 56 of the

- 1 -

KL2:2414401.1

Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7056, for summary judgment to (i) dismiss with prejudice the claim for relief as set forth in the Complaint (the "Complaint") for Declaratory Judgment by Plaintiffs TL Administration Corp., TL Administration Inc., and TL Administration UK (collectively, the "Debtors") dated August 9, 2005; and (ii) grant in favor of the Defendants all relief requested by and through Count I of the counterclaim of the Defendants' Answer and Counterclaim to Complaint for Declaratory Judgment dated September 12, 2005.  In support of the Motion, Defendants respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors do not dispute the fact that Defendants have purchased substantially all of the Debtors' assets – including estate receivables and causes of action. Nonetheless, based upon an improper expansion of the phrase "insurance proceeds," the Debtors seek to reclaim for themselves receivables that were rightfully purchased by the Defendants.  As demonstrated by the express terms of the Purchase Agreement and as further set forth below, the Debtors' argument must fail.  As a matter of law, the term "insurance proceeds" refers to an insurer's payout to an insured on a covered claim, not to receivables relating to tortious actions of an insurance broker.   In addition, the Debtor's second line of argument, to wit, that the rights in question belong to the Debtors because they are "related to" an Excluded Asset, must likewise fail as a matter of law.  By their Complaint, the Debtors do not assert ownership of a claim that is "related to" an underlying asset that was defined in the Purchase Agreement as an "Excluded Asset."  Rather, the Debtors seek to reclassify a claim related to a non-excluded asset (rights related to brokerage services) by arguing that if the underlying non-excluded asset is somehow related to an Excluded Asset then it too must be considered an Excluded Asset.  In so doing, the

Debtors seek to unilaterally amend the Purchase Agreement to expand the expressly defined scope of Excluded Assets in a manner that would turn the contract on its head. Because there is no reasonable question of fact or law that the Settlement Proceeds belong to the Defendants, summary judgment in favor of Defendants and against the Debtors is appropriate.

## BACKGROUND

### A. The Debtors' Bankruptcy Proceedings

2. On September 4, 2003 (the "Petition Date") the Debtors filed for protection under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York. See Complaint ¶ 6.

3. The bankruptcy proceedings closely overlapped with proceedings before the District Court for the Southern District of New York, which are now consolidated as *In re Ephedra Products Liability Litigation*, 04 MD 1598. By and through a series of orders from the District Court, the bankruptcy reference was withdrawn and the District Court assumed direct jurisdiction over all aspects of the Debtors' bankruptcy proceeding, save for certain express exclusions. On October 9, 2005, the District Court re-referred this Adversary Proceeding to the Bankruptcy Court. *See* Koevary Decl. Exs. 1 & 2.[1]

### B. The Purchase Agreement and the Insurance Policies

4. On October 31, 2003, the Bankruptcy Court entered the Sale Order approving the Purchase Agreement dated as of September 4, 2003 between the Debtors and the Defendants (the "Purchase Agreement"), which provided for, among other things, the sale of substantially all of the Debtors' assets to the Defendants. Specifically, Section 2.1 of the Purchase Agreement provided for the transfer of:

---

[1] "Koevary Decl," refers to the Declaration of Jonathan T. Koevary, dated October 12, 2005.

- 3 -

> all the assets, properties, rights and claims of every kind and description of each of the Sellers used in the Business (other than Excluded Assets), whether real or personal, tangible or intangible, vested or unvested, contingent or otherwise, wherever located and whether existing now or hereinafter acquired, as the same shall exist on the Closing Date, whether or not any of such assets, properties, rights or claims have any value for accounting purposes or are carried or reflected on or specifically referred to in books or financial statements of Sellers . . . .

*See* Koevary Decl. Ex. 3 § 2.1.

5. Prior to Petition Date, the Debtors were subject to multiple liability claims, including numerous claims for the sale of certain products including alkaloids from the herb known as "Ma Huang," also known as ephedra. Like most corporations, in order to minimize the risk of direct liability, including liability arising from ephedra tort claims, the Debtors prepetition had obtained a variety of insurance policies (the "Insurance Policies") under which the insurance providers were obligated to indemnify the Debtors for tort and other claims covered under the terms of the Insurance Policies. Certain of these Insurance Policies had been purchased through the insurance brokers Marsh & McClennan Companies, Inc. ("Marsh") and others through Aon Corporation (together with its subsidiaries and affiliates, "Aon"). *See* Koevary Decl. Ex. 4 ¶¶ 26 & 27.

6. Pursuant to the Purchase Agreement, the Debtors' estates remained liable for dealing with all claims against the estates, including specifically ephedra-based tort claims. *See* Koevary Decl. Ex. 3 § 2.4(l) (defining "Excluded Liability" as including any liability of debtors arising out of claims of negligence, personal injury, product damage, product liability, product warranties . . ."). Accordingly, it was agreed that the Insurance Policies (and proceeds thereof) would *not* be transferred to the Defendants, but would remain with the estates to pay the litigation claims. *See* Koevary Decl. Ex. 3 § 2.2(i) (defining Excluded Assets as including "all insurance policies or rights to proceeds thereof relating to the assets, properties, business or

- 4 -

operations of Sellers . . ."). Indeed, the parties expressly recognized the purpose of excluding these assets for use by the estate following the asset sale. *See id.* § 8.13 (obligating the Debtors to use their best efforts to ensure that any plan of reorganization provides that "existing insurance policies will continue to be used to pay any product liability claims").

### C.   The Recovery Lawsuits

7.   Beginning in October 2004, in his capacity as *parens patriae*, the Attorney General for the State of New York brought separate suits against Marsh and Aon (the "Recovery Lawsuits"). The Recovery Lawsuits alleged that Marsh and Aon engaged in anticompetitive and fraudulent behavior, including "bid rigging" in order to receive increased payment for their brokerage services  *See* Koevary Decl. Ex. 4 ¶ 23.

8.   The Recovery Lawsuits were brought against Marsh and Aon in their capacity as insurance brokers, not as insurers under the Insurance Policies. *See* Koevary Decl. Ex. 6 ¶ 14. Indeed, neither Marsh nor Aon were Insurers under the Insurance Policies. *See id.* ¶¶ 15 & 18. Marsh and Aon have reached settlement agreements with the Attorney General, where each has arranged to pay restitution to certain parties or their successors who used Marsh or Aon's services to obtain insurance and who also "opt-in" to the settlement (the "Settlement Proceeds"). *See Generally* Koevary Decl. Exs. 7 & 8. For example, on January 30, 2005, Marsh entered into the Marsh Settlement, pursuant to which it agreed to pay $850,000,000 into a fund to compensate clients who had used Marsh's brokerage services to obtain insurance. *See* Koevary Decl. Ex. 4 ¶ 24   The Marsh Settlement will provide approximately $410,000 (over four years) to the Debtors or their assignees. *See id*. ¶ 26.

9.   The Settlement Proceeds are not payouts on the Insurance Policies themselves but are instead payments resolving tort claims against the brokers based on their brokerage services – which claims are independent and apart from the underlying terms of the

- 5 -

Insurance Policies. *See Generally* Koevary Decl. Ex. 7 & 8.  The amount of any settlement payments made by Marsh or Aon to settle the Recovery Lawsuits will not reduce the amount of remaining coverage under the Marsh or Aon Prepetition Policies. *See* Koevary Decl. Ex. 7 at 3 ("[t]he release does not preclude participating policyholders from seeking relief against non-Marsh entities or individuals.").

### D.  The Present Action

10.  On August 12, 2005, the Debtors brought the Complaint against Defendants seeking a declaratory judgment that the rights to the Recovery Lawsuits and the Settlement Proceeds belonged exclusively to the Debtors.

11.  On September 12, 2005, the Defendants answered the Complaint.  That answer included a counterclaim (the "Counterclaim") against the Debtors seeking a declaratory judgment that the rights to the Recovery Lawsuits and the Settlement Proceeds belong exclusively to the purchasers under the Purchase Agreement.

12.  In the interim, by letter dated September 7, 2005 (the "September 7 Letter"), the Debtors and the Defendants agreed that the Debtors would opt-in to the Marsh Settlement and would retain the Settlement Proceeds in a segregated account pending the outcome of these proceedings.  *See* Koevary Decl. Ex. 9.  The September 7 Letter was expressly without prejudice to the substantive rights of either party regarding the Settlement Proceeds.  *See id.*

13.  On September 28, 2005, this Court held a pre-summary judgment motion and pre-trial conference.  The Court acknowledged that a question arose as to whether, by the terms of the District Court's Order Withdrawing the Reference dated March 22, 2005, the present controversy qualified as matter which remained referred to the District Court.  The Court ordered the parties to seek guidance from the District Court as to the jurisdictional matter.  On

October 9, 2005, the District Court re-referred this Adversary Proceeding to the Bankruptcy Court.  *See* Koevary Decl. Exs. 1 & 2.

14. On October 3, 2005, the Debtors filed their answer to the Counterclaim. *See* Koevary Decl. Ex. 6.

## JURISDICTION

15. This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

16. The predicate for the relief requested is Fed. R. Bankr. P. 7056.

## ARGUMENT

17. Summary judgment is properly granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56(e); *see also* Fed. R. Bankr. P. 7056.  To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); it must present "significant probative supporting evidence" that a genuine issue of fact exists.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of fact for trial and summary judgment is appropriate.  *Matsushita*, 475 U.S. at 587; *accord Island Software & Computer Serv. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005).  In such circumstances, summary judgment "is properly regarded . . . as an integral part of the Federal Rules as a whole, which are designed 'to secure

the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted).

18. Here, it is beyond dispute that the Defendants have rightfully purchased substantially all of the Debtors' assets (including receivables and causes of action) other than the "Excluded Assets." *See* Koevary Decl. Ex. 3 § 2.1. Nonetheless, pursuant to the Complaint, the Debtors make two distinct arguments as to why the Recovery Lawsuits should be deemed to have remained behind with the estates. First, the Debtors claim that the proceeds of the Recovery Lawsuits are "insurance policies or proceeds thereof" and that therefore, they are "Excluded Assets" under the Purchase Agreement. *See* Koevary Decl. Ex. 4 ¶¶ 29-30. In the alternative, the Debtors argue that because the Recovery Lawsuits purportedly "relate to" insurance policies (which are defined as Excluded Assets), the Recovery Lawsuits therefore must themselves also be deemed Excluded Assets. *See id.* ¶ 31. As shown below, both of these arguments are belied by the very terms of the Purchase Agreement itself, and summary judgment in favor of the Defendants is therefore warranted.

### A. Neither the Recovery Lawsuits nor the Settlement Proceeds Constitute Insurance Proceeds as a Matter of Law.

19. An insurance policy is nothing more than a contract between an insurer and the insured for the payment of proceeds by the former to the latter upon a condition precedent set forth in the contract. See BLACK'S LAW DICTIONARY (7th ed.) (defining insurance policy as a "contract of insurance"). The phrase "insurance proceeds" refers to an insurer's payout to or on behalf of the insured on account of a claim covered by that policy. *See Alicia Ocean Transport, S.A. v. Equity Steamship Agencies, Ltd.*, 621 F. Supp. 479 (S.D.N.Y. 1985) (claims for casualty loss paid by insurance company to loss payees constituted insurance proceeds).

20.     It is likewise unambiguous that payment for claims against insurance *brokers* for tortious conduct outside of the terms of an insurance contract cannot constitute "insurance proceeds" from such a policy of insurance. For example, in the case of *Reymet Federal Credit Union v. Jones (In re Jones)*, 19 B.R. 293 (Bankr. E.D. Va. 1982) the defendant purchased an automobile subject to a security interest. *Id.* at 294. The defendant contacted an insurance agent to procure insurance, but the agent failed to procure collision coverage. When the automobile was damaged and the insurer denied the defendant's claim, the plaintiff obtained a judgment against the agent for an amount equal to the estimated damages to the vehicle. Subsequently, the secured creditor argued that it had a perfected security interest in the litigation recovery because the recovery constituted "proceeds" arising out of the insurance contract. Noting that the original suit was "based upon the broker's breach of contract to procure the insurance and not upon the contract of insurance itself," the court held that the action against the agent did not constitute insurance proceeds. Indeed the court found that proceeds arising from a suit against the broker could not substitute for the proceeds of an insurance policy itself, stating "Jones' judgment did not take place of the collateral itself, instead it recompensed her for the loss she sustained because of her agent's breach of contract." *Id*. at 295.

21.     Like *Jones,* the Recovery Lawsuits here are based upon claims against insurance brokers – they are not based upon claims under *any* insurance policy obtained through the services of those brokers. Accordingly, the Debtors' contention that the Recovery Lawsuits, which state neither a claim under any insurance policy nor for the proceeds of any insurance policy, somehow constitute "insurance policies or proceeds thereof" is entirely devoid of merit. *Id.; see also Scott v. Fifth Third Bank (In re Williams)*, 92 B.R. 761, 763 (Bankr. S.D. Ohio 1988) (security interest in "insurance or other proceeds thereon", did not extend to refund of

premiums because "insurance or other proceeds thereon . . . refers only to property damage or collision insurance covering the [property]").

22. While the law is unambiguous, the facts at bar make the point self-evident. It is simply indisputable that the payment of the Settlement Proceeds will not reduce the coverage available to the Debtors under the applicable Insurance Policies by even a single penny. The Settlement Proceeds are in addition to – not in lieu of – insurance coverage, and regardless of the outcome of the Recovery Lawsuits or the amount of the Settlement Proceeds, the amount available to the Debtors under the Insurance Policies will remain exactly the same. Under such a scenario, there can be no serious contention that the Settlement Proceeds or Recovery Lawsuits are insurance proceeds. *See Johns-Manville Corp. v. Asbestos Litigation Group,(In re Johns-Manville Corp.)*, 33 B.R. 254, 268 (Bankr. S.D.N.Y. 1983) (noting that a "pool of insurance proceeds is a finite pool with clearly defined parameters. The fund's contents have a very specific limit; the pool cannot be replaced or replenished . . . any forced payment . . . would obviously decrease the pool and leave fewer assets remaining to be divided among other claims.").

23. In short, the Complaint fails to cite any provision of the Purchase Agreement that would justify twisting the phrase "insurance policies or proceeds thereof" to mean anything but what the law, and common sense, purport that phrase to mean. As a matter of law, the term "insurance policies or proceeds thereof" cannot encompass a tort claim that: (a) is brought against a broker for anticompetitive behavior intended to increase payment for the broker's services; and (b) neither derives from nor seeks payment under any policy of insurance. As such, the Settlement Proceeds are Purchased Assets and belong to the Defendants.

**B.      The Recovery Lawsuits Are Not "Related to" to the Insurance Policies – Nor Are They Excluded Assets.**

24.    In the alternative, the Debtors assert that these Settlement Proceeds are "related to" insurance policies, and that this tenuous relationship renders the Settlement Proceeds "Excluded Assets" under the Purchase Agreement. *See* Koevary Decl. Ex. 3 § 2.1(p). Though creative, this argument contravenes both the intent and the express language of the Purchase Agreement.

25.    First, in Section 2.2 of the Purchase Agreement, the parties explicitly defined what would be considered Excluded Assets. Rights related to brokerage services were not among the assets so defined. *See* Koevary Decl. Ex. 3 § 2.2. Therefore, claims related to such brokerage services are not claims related to an Excluded Asset as defined in the Purchase Agreement. Notwithstanding the Debtors' current argument, there is absolutely nothing in Section 2.2(i) of the Purchase Agreement or elsewhere that provides for the right to expand the expressly defined scope of Excluded Assets to include claims related to non-excluded assets, which themselves are only tangentially related to Excluded Assets. The Debtors' proposed use of the "related to" language of Section 2.1(p) of the Purchase Agreement is not only so broad as to render the definition of "Purchased Assets" a nullity, but it also directly conflicts with the express language of the Purchase Agreement as to what such Purchased Assets are to include. *See id*. § 2.1(p).

26.    The "related to" language on which the Debtors' argument rests is set forth in Section 2.1(p) of the Purchase Agreement. Section 2.1 of the Purchase Agreement generally provided for the transfer to the Defendants of substantially all of the Debtors' assets, properties, rights and claims of every kind and description, and subsections 2.1(a) and (p) set forth certain illustrative transferred assets as "including":

- 11 -

>(a) all accounts receivable other than any accounts receivable and any other rights to receive payments arising out of or in connection with any Excluded Asset or the sale or distribution of Excluded Products; and . . .
>
>(p) any rights, claims or causes of action of Sellers against third parties relating to the Business or the Purchased Assets arising out of events occurring on or prior to the Closing Date, but excluding those related to the Excluded Assets or the Excluded Products and those specified in Section 2.2(j).

Koevary Decl. Ex. 3 § 2.1.

27. So there was no mistaking how broad the transfer clause was meant to be, the word "including" was assigned its own definition under the Purchase Agreement: "[t]he word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and *shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.*" Koevary Decl. Ex. 3 § 1.3. (emphasis added).

28. Here, the Settlement Proceeds are no different than rights to any garden variety receivable that Defendants paid for at the time of the asset transfer, which are expressly covered as "Purchased Assets" in the general language set forth in Section 2.1 of the Purchase Agreement. The Debtors' attempt to recharacterize the Recovery Lawsuits, which relate to non-excluded assets, as Excluded Assets by virtue of the "related to" language of Section 2.1(p) misses the mark because the parties contractually agreed that the illustrative examples set forth in Section 2.1(p) were *not* meant to limit the earlier general transfer provision set forth in Section 2.1. Indeed, reading the Purchase Agreement as providing that claims related to non-excluded assets are in fact Excluded Assets if the non-excluded asset tangentially relates to an Excluded Asset would essentially mean that the Defendants paid $65 million for *nothing* because all of the Debtors' prepetition assets were inter-related in some respect. *See Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*, 2005 WL 289723, \*7 (S.D.N.Y. Feb. 8, 2005) (noting that "it is unlikely . . . that a contract would list four exceptions in one section of a contract and

provide for a fifth, narrowly tailored exception, elsewhere in the contract" and that to interpret the contract in such a manner would be "nonsensical."). Hence, to contend that after the parties' expressly enumerated all exceptions to the transfer in the definition of "Excluded Assets," the parties excluded yet another entire set of assets in another paragraph of the agreement – no less one providing a purposefully unrestricted list of included assets to be transferred – is to give the Purchase Agreement a nonsensical reading equivalent to that presented in *Greylock*.

29. Equally clear is the fact that neither the Recovery Lawsuits nor the Settlement Proceeds are "related to" the Insurance Policies or proceeds thereof (or any other Excluded Assets). As noted above, the Recovery Lawsuits are actions in tort against third-party insurance brokers. The actions do not arise out of the terms of the insurance policies or relate to claims that might be brought under such policies. Rather, they arise out of the brokers' alleged misconduct in taking kickbacks for their services – conduct that is wholly independent and apart from the policies themselves or the terms thereof. As noted by the Supreme Court, "[a]lthough the phrase 'relating to' is a relatively broad phrase, it must be given its 'common-sense meaning . . . .'" *Camferdam v. Ernst & Young Inter'l Inc.*, 2004 WL 1124649 (S.D.N.Y. May 19, 2004) at *2 n.3 (citing *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990).[2] Under any such common sense reading, the Debtors' argument fails.

30. The Debtors' expansive interpretation of the phrase "related to" runs contrary to the express intention of the parties as set forth explicitly in the Purchase Agreement.

---

[2] In *Camferdam* the parties had an agreement to arbitrate "'[a]ny controversy or claim arising out of or relating to tax and tax related services.'" *Id.* at *2. Before the court was the question of whether a factual dispute regarding the terms of the arbitration was itself arbitrable. Although there was a tenuous connection between the terms of the arbitration clause and the tax services, the court held that "relating to" did not extend to the dispute regarding the terms of arbitration, because "[a]though the present dispute regarding which arbitration forum and procedures shall apply could easily be categorized as a dispute arising out the parties' agreement, it does not relate to the tax services Defendants were to provide to Plaintiffs." *Id.*

KL2:2414401.1

The Purchase Agreement contains a general presumption that an asset is a Purchased Asset absent a statement to the contrary.  *See* Koevary Decl. Ex. 3 §§ 1.3 & 2.1.  In addition, the Purchase Agreement sets forth the particular reason as to *why* the Insurance Policies were specified as Excluded Assets in the first place – to provide a mechanism for the Debtors to gain access to the proceeds of insurance policies and use such proceeds towards paying Ephedra-related and other claims.  *See id.* § 8.13.  Here, it is undisputed that the Recovery Lawsuits will *not* affect the Debtors' coverage under the insurance policies insofar as any Settlement Payments will *not* reduce the Debtors' coverage under the Insurance Policies.  The Debtors' argument that the Recovery Lawsuits or the Settlement Proceeds are related to Excluded Assets is a fiction, insofar as the Purchase Agreement provides that while the Debtors maintained the rights to the proceeds of the policies against the Insurers, the rights to third party causes of action arising from non-excluded claims were transferred to the Defendants.  To award the Debtors anything greater than the amounts covered under the policies would contradict the Purchase Agreement and thus constitute a pure windfall in favor of the Debtors under such circumstances.

**CONCLUSION**

WHEREFORE, for all of the foregoing reasons, Ideasphere respectfully requests that the Court grant summary judgment in favor of the Defendants and against the Debtors on all counts of the Complaint and Answer.

Dated: New York, New York
October 14, 2005

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: /s/ Matthew J. Williams
Matthew J. Williams, Esq. (MW 4081)
Jonathan T. Koevary, Esq. (JK 5730)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for Defendants

KL2:2414401.1