KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Matthew J. Williams, Esq. (MW 4081)
Jonathan T. Koevary, Esq. (JK 5730)

Attorneys for Ideasphere, Inc. and TL Acquisition Corp.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
**In re:**                                                     :   **CHAPTER 11**
                                                               :
**TL ADMINISTRATION CORPORATION et al.**                       :
**(f/k/a/ TWINLAB CORPORATION et al.),**                       :
                                                               :
                                                               :   **Case No. 03-15564 (RDD)**
                    **Debtors.**                               :
---------------------------------------------------------------x
                                                               :
**TL ADMINISTRATION CORPORATION et al.**                       :
**(f/k/a/ TWINLAB CORPORATION et al.),**                       :   **Adv. No. 05-02376 (RDD)**
                                                               :
                    **Plaintiffs,**                            :
                                                               :
            - v. -                                             :
                                                               :
**IDEASPHERE INC.,**                                           :
**AND TL ACQUISITION CORP.**                                   :
**Defendants.**                                                :
---------------------------------------------------------------x

**RESPONSE IN OPPOSITION TO**
**DEBTORS' MOTION FOR SUMMARY JUDGMENT**

Defendants Ideasphere, Inc. and TL Acquisition Corp. (collectively "Defendants"), by their attorneys, Kramer Levin Naftalis & Frankel LLP, hereby submit this response in opposition to Plaintiffs TL Administration Corp., TL Administration Inc.,

- 1 -

and TL Administration UK (collectively, the "Debtors") Summary Judgment Motion dated October 14, 2005 (the "Debtors' Motion").[1] Annexed as Exhibit A hereto is response to the Debtors' Statement of Undisputed Material Facts pursuant to Local Rule 7056-1.

## PRELIMINARY STATEMENT

Based upon the Debtors' Complaint, it appeared as though this Court would have two questions before it. However, the first assertion in the Complaint – *i.e.*, that the Recovery Lawsuits and/or the Settlement Proceeds are "insurance policies or the proceeds thereof" – is left unaddressed in the Debtors' Motion. It is uncontroverted that neither the Recovery Lawsuits nor the Settlement Proceeds constitute "insurance policies or the proceeds thereof," *see* Defendants' Memorandum ¶¶ 19-23, and the Debtors have apparently ceded this point. Therefore, the only issue remaining is the Debtors' alternative theory that the Settlement Proceeds are "related to" "insurance policies and the proceeds thereof" and are thus property of the Debtors' estate. Neither the facts of this underlying dispute nor the law cited by the Debtors lends credence to this theory. As such, the Debtors' summary judgment motion should be denied.

---

[1] The parties to this adversary proceeding cross-moved for summary judgment on October 14, 2005. Capitalized terms used herein and not otherwise defined herein have the respective meanings ascribed to them in the Defendants' Memorandum of Law in Support of their Motion for Summary Judgment dated October 14, 2005 (the "Defendants' Motion"). This Response refers to the exhibits attached to the Koevary Declaration as filed with this Court in connection with the Defendants' Motion.

KL2:2415406.2

## ARGUMENT

### A. The Recovery Lawsuit and Settlement Proceeds Neither Relate to Nor Affect Any Excluded Asset

In their Memorandum in Support of Summary Judgment (the "Debtors' Memorandum"), the Debtors appeal to the Court to apply ordinary meanings with common sense. As a matter of common sense, it must be recognized that the relevant assets that were excluded in the Purchase Agreement for the benefit of the Debtors' estate were not insurance policies themselves. The policies are merely pieces of paper. Rather what was expressly retained for the Debtors' estate were the rights granted to the insured under each excluded policy of insurance, and, as set forth explicitly in the exclusionary language of the Purchase Agreement, the proceeds potentially available by exercise of the rights granted under those policies.

Not only is it uncontroverted that the Recovery Lawsuits do not arise out of the Debtors' insurance policies, it is also indisputable that they do not affect in *any* manner *any* rights afforded the Debtors under *any* of those policies. Likewise, no matter what the outcome of the Recovery Lawsuits or the amount of the Settlement Proceeds distributed pursuant thereto, the total amount of insurance proceeds (as well as the amount under any single policy) available to the Debtors' estate pursuant to Debtors' rights in those policies will remain *completely* unaffected. There is no relation, connection, association or correlation that can change those simple facts. The rights excluded for the benefit of the Debtors' estate will remain totally static, neither strengthened nor weakened, no matter the outcome of the instant matter before the Court, because there is no relation between the Recovery Lawsuits and the Excluded Assets.

KL2:2415406.2

As set forth above, the Debtors no longer contend, because they cannot contend, that the brokerage services of Marsh or Aon, the Recovery Lawsuits or the Settlement Proceeds are themselves Excluded Assets. Of equal importance, however, is the fact that the Recovery Lawsuits and the Settlement Proceeds are actually included assets that were sold to the Defendants. *See* Koevary Decl, Ex. 3 §§ 2.1 (providing for the sale of all non-excluded assets generally), 2.1(a) (setting forth accounts receivable as part of the non-exhaustive list of assets purchased) & 2.1(p) (setting forth claims against third parties as part of the non-exhaustive list of assets purchased). As a result, the Debtors do not now seek to retain ownership of claims related to Excluded Assets but rather to take back ownership of claims (which were sold for consideration paid) related to an *included* asset merely because that included asset has a tangential – though not material – connection to an Excluded Asset. In this case, where the claims at issue have *absolutely no affect* on the Debtors' rights under the excluded insurance policies or to the proceeds thereof, the Debtors' arguments not only violate the terms of the Purchase Agreement but run counter to the very case law upon which the Debtors rely.

### B. Coregis and its Progeny Do Not Support Debtors' Position Under the Facts of This Case

In their Memorandum, the Debtors rely on a single quotation from caselaw without even attempting to address the meaning of the proposition of law set forth therein. The caselaw in this matter, in fact, belies the Debtors' claims.

KL2:2415406.2

1.  ***Coregis* Does Not Stand for the Blanket Proposition Urged by the Debtors**

The case law upon which the Debtors' argument rests is *Coregis Ins. Co. v. Am. Health Found, Inc.*, 241 F.3d 123 (2d Cir. 2001). In a general sense, the relevant holding of *Coregis* states a principle which is not in dispute: that the words found in a contract, unless otherwise defined, ought to be given their plain meaning. *See Coregis*, 241 F.3d at 128-29. On a more detailed level, the Debtors also look to *Coregis* for the findings that (i) the plain meaning of "related to" is a broad meaning based on connectedness; and (ii) this meaning, in the context of claims, is not limited to claims "arising out of" a particular item, act or occurrence. The Defendants do not dispute these general tenets. The Defendants do dispute, however, that *Coregis* stands for the principle that any level of connection creates "relatedness" without an analysis of the actual connection or the meaning and purpose of the terms of the contract at issue. An examination of the application of these general principles in *Coregis* itself, as opposed to just a blanket quotation of the same, shows that the holding of that case does not support Debtors' argument in the case at bar.

In *Coregis*, the plaintiffs purchased an insurance policy that provided an exclusion for actions "[a]rising out of, based upon, or related to," among other things, "[t]he insolvency of the company." *See id.* at 126. A lawsuit was thereafter filed alleging that the plaintiffs made material misrepresentations in their applications for sizeable loans, which misrepresentations ultimately led to the financial collapse of the plaintiffs' companies and their inability to repay those loans. *See id.* at 124-25. When the plaintiffs sought coverage under their insurance policy for these claims, the insurer denied coverage based on the insolvency exclusion. While the Second Circuit found that

the claims against the plaintiffs did not technically arise from the plaintiff companies' insolvency (being stated instead in terms of negligence, breach of contract, breach of duty of care, and deceptive business practices), the Court nevertheless upheld the insurer's denial of coverage finding that such claims were "related to" the plaintiff companies' insolvency. The Court reached this holding, however, based upon specific factual findings regarding the claims at issue.

While the Court in *Coregis* took note of the fact that the claims against the plaintiffs did not sound in insolvency, the Court also found that the companies' insolvency was the primary and essential feature of these causes of action, stating:

> The complaints both allege, *inter alia*, that plaintiffs never performed . . . **because** the Companies' nursing homes suffered virtual financial failure. *Id.* at 129 (emphasis added).
>
> Here as well, the Lawsuits are related to the Companies' financial failure by the very wording of the complaints, which explicitly refer to, discuss, and **seek redress for that failure**." *Id.* at 131 (emphasis added).
>
> It remains the case that the Companies' financial failure **is the injury for which damages are sought** in the Receiver Action **and the cause of CHEFA's principal injury** . . . ."
> *Id.* at 129-30 (emphasis added).

In no uncertain terms, the Court in *Coregis* found that the claims against the plaintiffs "related to" the insolvency exclusion of the insurance policy not because of a colloquial and immaterial connection but because insolvency was, upon a factual analysis, the very essence and cause of the claims. In the face of a contract provision that was unambiguously intended to protect the insurer against exactly such claims created by virtue of the insured's insolvency, the holding in *Coregis* was perfectly sound.

KL2:2415406.2

In the present case, no such connection exists. The stated purpose of incorporating the relevant Excluded Asset into the Purchase Agreement was to retain for the benefit of the Debtors' estate the rights under the Debtors' insurance policies and to the proceeds thereof to satisfy the express requirement that the Debtors exercise those rights in conjunction with the estate's defense of contingent liabilities left with the estate. *See* Koevary Decl, Ex. 3 ¶ 8.13 (obligating the Debtors to use their best efforts to ensure that any plan of reorganization provides that "existing insurance policies will continue to be used to pay any product liability claims"). Unlike *Coregis*, the disputed claims in this case do arise from, connect with or impact in any way (either legally or factually) the terms of the excluded insurance policies, the rights to proceeds thereof, or the purposes of the unambiguous language of the Purchase Agreement.

### 2.  Debtors' Arguments Also Contravene *Vermont Pure Holdings*

The only case other than *Coregis* cited by Debtors in support of their "related to" argument is *Vermont Pure Holdings, Ltd. v. Descartes*, 140 F. Supp.2d 331, 334 (D. Vt. 2001). *Vermont* is a descendant of *Coregis*, and likewise does not support a finding for the Debtors.

In *Vermont*, the plaintiff simultaneously entered into two contracts with defendants, one a license agreement whereby defendants licensed software to the plaintiff and the other a services agreement whereby defendants agreed to service the software provided under the license agreement. While the license agreement contained a mandatory arbitration clause requiring arbitration of any dispute "arising out of or relating to" the license agreement, the services agreement contained no such provision.

KL2:2415406.2

The plaintiff, unhappy with the performance of the software system, brought suit in federal court, arguing that the claims were brought pursuant to the services agreement (no arbitration provision) and not the license agreement. Following *Coregis*, the Court held that venue was improper, finding that plaintiff's claims did not need to arise from the license agreement to trigger the arbitration clause therein and, in fact, related to that agreement, thus triggering the clause. Once again, however, the Court reached this conclusion on the basis of the strong ties between the substance of the plaintiff's claims and the substance and purpose of the license agreement containing the arbitration clause.

As an initial matter, both the license agreement and the services agreement were executed on the same day pursuant to a proposal by the defendants to both provide and service the software system. *Id.* at 332. In addition, the Court found that the problems giving rise to the plaintiff's complaint "stem from the inadequate performance of the [software] system, which is made up, at least in part, by the software and hardware covered by the [license agreement]." While the Court recognized that installation services may have also played a role in the alleged performance problems, it found "little doubt that the performance . . . bears some connection to the software and hardware . . . ." *Id.* at 335. The Court further noted the difficulty in differentiating damages arising from the service agreement as compared to the license agreement, as well as the potential for a double recovery if separate causes of action were allowed under each agreement. *Id.* at 338 n.8. Finally, and importantly, the Court found that the plaintiff's complaint "explicitly" related to the license agreement in that one count sought a declaratory

judgment that plaintiff was not liable to pay the fees due under *the license agreement itself.* *Id.* at 336.

Unlike the Debtors, who espouse a superficial "related to" analysis that blindly relies on any form of connectedness, the Court in *Vermont* at every turn looked for and found a substantive relationship between the disputed claims and the rights, obligations and purposes of the contract at issue. Stated quite simply, no such facts exist in the matter at hand.

### 3. The Debtors' Position Is Overbroad

Under the facts of the case at hand, the law does not support a finding for the Debtors, dictating instead that the term "related to" not be read so over broadly as to usurp the purpose of the context in which it appears.

For example, in *Camferdam v. Ernst & Young Inter'l Inc.*, 2004 WL 1124649 (S.D.N.Y. May 19, 2004), the plaintiffs entered an agreement with the defendant regarding the provision of tax related services. *Id.* at *2. The parties' agreement required arbitration of "[a]ny controversy or claim arising out of or relating to tax and tax related services" provided by defendant to the plaintiffs. *Id.*

When a dispute arose, the plaintiffs filed suit in federal court to resolve a concurrent disagreement about the arbitral forum and procedures required under the arbitration clause. *Id.* at *1. The Court was thus presented with the question of whether the "related to" language of the arbitration clause in the parties' agreement required that procedural disputes regarding the arbitration itself had to be arbitrated.

Given the fact that (i) the agreement from which the mandatory arbitration clause arose was specifically related to the provision of tax related services, and (ii) the

- 9 -

KL2:2415406.2

arbitration clause required arbitration of "any controversy . . . relating to tax and tax related services," it is difficult to conceive how, under the Debtors' logic, a dispute over arbitration procedures for that very agreement could not be "related to" tax services and therefore itself be subject to arbitration. The Court in *Camferdam*, , however, did not take such a superficial view:

> Rather than embodying an agreement to arbitrate any claim arising out of the parties' agreement, the clause limits arbitration to disputes relating to the tax services Defendants were to provide Plaintiffs. Although the present dispute regarding which arbitration forum and procedures apply could easily be categorized as a dispute arising out of the parties' agreement, it does not relate to the tax services Defendants were to provide Plaintiffs.

*Id.* at *2. The Court continued:

> Although the phrase "relating to" is a relatively broad phrase, it must be given its "common sense" meaning"— that is, something "relates to" tax services if it has "a connection with or reference to" **the services**.

*Id.* at *2 n.3 (citing *Ingersoll-Rand Co v. McClendon*, 498 U.S. 133, 138 (1990)) (emphasis added). Thus, notwithstanding that the agreement related directly to the services, the Court held that a dispute arising from that agreement was not subject to the arbitration provision contained therein because the dispute itself did not directly derive from, impact or connect with the services. The Court determined plainly that if "the parties had intended to submit these types of contract interpretation issues to an arbitrator, they should have included a broader arbitration clause." *Id.* at *2.

The same is true here. If the parties had wished to make insurance brokerage services an Excluded Asset, they could have done so. They did not. Instead, the parties excluded only insurance policies and the proceeds thereof. While the parties

KL2:2415406.2

separately carved out of the Purchased Assets section of the Purchase Agreement claims related to Excluded Assets, common sense and general tenets of contract construction dictate that this carve out encompassed only claims related to the specific assets that had in fact been excluded by the parties – in this case, the rights to the benefits of the insurance policies and the proceeds thereof. As in *Camferdam*, the clause should not be read so broadly as to create an new class of Excluded Assets covering claims relating to assets the parties did not choose themselves to exclude – in this case, brokerage services.

Similarly, in a case where the Second Circuit distinguished its holding in *Coregis* (notably due to precisely the specific contextual analysis noted herein above), the Court spoke at length about danger of lending an overbroad interpretation to the term "related to." In *Empire Healthchoice Assurance Inc., v. McVeigh*, 396 F.3d 136 (2d Cir. 2005), the Second Circuit was required to determine whether federal subject matter jurisdiction existed under the Federal Employee Health Benefits Act (FEHBA) to hear plaintiff's claims. In its analysis, the Court set forth the following two prong test to determine whether the plaintiff's claims triggered a statutory requisite of federal preemption under § 8902(m) of FEHBA: "First, preemption only occurs when the FEHBA contract terms at issue "relate to the nature, provision, or extent of coverage or benefits. Second, federal law may only preempt state or local laws if those laws relate to health insurance or plans." *Id.* at 145 (internal quotations omitted).[2]

---

[2] In *Empire*, the Second Circuit took notice of a presumption against the finding of preemption of state law in context presented. *Empire*, 396 F.3d at 145. Understanding that this context guided the Court's decision, in part, the Court's analysis nevertheless remains applicable to the present matter which likewise must assess the instant claims in the context of the Purchase Agreement and the presumptions expressed therein by the parties.

KL2:2415406.2

Recognizing two independent requirements of this test, the Court rejected the notion, one similar to that presented by the Debtors, that the interpretation of a limited provision should swallow the purpose of the whole in which it appears. In objecting to a dissenting opinion that called for federal preemption of state laws of "general application that make absolutely no reference to health insurance or plans," as required by the second prong set forth above, "but are used in a given case to construe or enforce FEHBA plans," *see id.* at 146, the Court stated:

> In our view, this reading of § 8902(m)(1) renders the second limiting condition meaningless. This is because *every* state or local law applied to a dispute satisfying the first condition (that is, every state law applied to a dispute involving a contract term relating to coverage or benefits) will ipso facto affect the construction or enforcement of that term. Thus, under the dissent's reasoning, FEHBA contract terms will preempt every state or local law so long as the first requirement is satisfied.

*Id.* at 146. A similar risk exists in the present case, wherein the Debtors seek to make broad use of one provision, "related to ... Excluded Assets," without giving effect to the other necessary limiting provision, which sets forth that which comprises the Excluded Asset at issue. By ignoring the second, limiting provision, the Debtors would have the Court create a vortex into which every claim that could conceivably connect with insurance would be swallowed.

Like the Debtors here, the dissent in *Empire* sought to support its position by arguing that the term "relates to" has been construed "quite broadly" in a number of cases. In rejecting this contention, the Court stated, "As this Court, our sister circuits and the Supreme Court have recognized, the precise meaning of the vague term 'relates to' depends on the larger statutory context." *Id.* at 147. Noting the presumption against

KL2:2415406.2

preemption, the Court cautioned against promoting an infinite interpretation of the term "relating to" that would overrun the purpose of the context in which it appeared, stating:

> The Supreme Court has specifically warned against overly-broad interpretations of the term, noting that "**[i]f 'relates to' were taken to extend to the furthest stretch of indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere.**" To define "relates to" so broadly "would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality."

*Id.* at 147 (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 at 665) (emphasis added).

Without disregarding the underlying context of a statutory analysis with a presumption against preemption, the basic analysis is no different in the present case. The Purchase Agreement has a broad and general presumption, expressly set forth in Section 2.1, that all assets, unless explicitly excluded, are Purchased Assets. *See* Koevary Decl, Ex. 3 § 2.1. The Purchase Agreement also limits Excluded Assets to those that are expressly excluded by the parties. To accept the overbroad interpretation of "related to" proffered by the Debtors, would result in, as forewarned by the Supreme Court, making the limitation on Excluded Assets a sham and effectively reading out the presumption in favor of Purchased Assets from the Purchase Agreement. As a result, an asset that was not expressly an Excluded Asset, and therefore was a Purchased Asset, would be swallowed by and become an Excluded Asset, though never contemplated to be so by the parties.

As set forth above, the Second Circuit in *Empire* also rejected the dissenting judge's reliance on *Coregis*. Importantly, in distinguishing the case, the Court

- 13 -

looked to the specifics of the factual analysis it undertook in that matter, as opposed to a general definitional statement, in concluding that the case failed "to justify the excessively broad interpretation of 'relate to'" favored by the dissent. *Id.* at 148. The Court highlighted specifically that in *Coregis* it had found that the underlying claims had explicitly sought redress for financial failure, thus invoking the insolvency clause, and that no similar explicit reference existed in the state law at issue in *Empire*. *Id.* at 148. Accordingly, the Court found that "*Coregis's* rationale therefore does not apply." *Id.* at 148.

The case law makes clear that in contrast to the Debtors' contention that "related to" must be read in a vacuum "to extend to the furthest stretch of indeterminacy" so "relations stop nowhere," that the term must, in fact, be fully considered in the context and circumstances in which it appears. In the context and circumstances presented to the Court in this case, the Debtors' argument must fail.

### C.   The Debtors' Assertions Controvert the Purchase Agreement

As discussed at length in the Defendants' Memorandum, the Purchase Agreement provided for the transfer of all assets not expressly excluded by the parties. *See* Defendants' Memorandum ¶ 28. For this purpose, the word "including" itself was explicitly defined in the Purchase Agreement to have a very broad construction: "[t]he word "including" or any variation thereof means "including, without limitation" and *shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.*" See *id.* ¶ 27. The Purchase Agreement also provided for an unexhaustive list of inclusions, "including" the assets at issue in this matter: accounts receivable and third parties causes of action. *See id.*

By contrast, the Purchase Agreement provided for a limited set of Excluded Assets, among them "insurance policies or the proceeds thereof." *See id.* ¶ 6. With regard to this particular Excluded Asset, the parties affirmatively provided the purpose for the exclusion by expressly obligating the Debtors to use proceeds arising from the Insurance Policies to pay product liability claims. *See id.* As set forth in the Debtors' Memorandum, it is uncontroverted that neither the Recovery Lawsuits nor the Settlement Proceeds fall under the rubric of this particular exclusion. *See* Debtors' Memorandum at 6. Thus, the Debtors seek to expand the scope of this exclusion by reference to a portion of a subclause in the non-exhaustive list of Purchased Assets which provides that the assets transferred include "any rights, claims or causes of action of Sellers against third parties relating to the Business or the Purchased Assets arising out of events occurring on or prior to the Closing Date, but excluding those related to the Excluded Assets or the Excluded Products and those specified in Section 2.2(j)." *See* Koevary Decl, Ex. 3 § 2.1(p). The Debtors entire theory, therefore, relies not on a broad exclusion, but rather on a narrow limitation of an otherwise unrestricted inclusion.

The Debtors seek to gloss over the fact that the clause upon which their case relies falls nowhere within the list of eleven specified categories of Excluded Assets itemized by the parties. Such placement (or lack thereof) cannot, however, be ignored. *See* Defendants' Memorandum at 28; *Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*, 2005 WL 289723, *7 (S.D.N.Y. Feb. 8, 2005) (noting that "it is unlikely . . . that a contract would list four exceptions in one section of a contract and provide for a fifth, narrowly tailored exception, elsewhere in the contract" and that to interpret the contract in such a manner would be "nonsensical."). Had the parties

KL2:2415406.2

intended to include brokerage services or claims related thereto as an Excluded Asset they could have, but they did not. The Debtors should not now be heard for wishing that they had drafted the Purchase Agreement differently. *Cf. Camferdam* at *2 (the term "related to" should not be used to expand the scope of the arbitration clause drafted by the parties).

## CONCLUSION

In short, the Debtors have failed to demonstrate that the Purchase Agreement provides them any rights in the Recovery Lawsuits and/or to the Settlement Proceeds thereof. The Debtors "related to" argument is entirely conclusory. In support of this argument, the Debtors have cited to no language in the Purchase Agreement other than the term "related to" itself. The Debtors have cited to the language, but not the analysis, of only two cases without providing any reasoning as to why the propositions set forth in those cases could support the overbroad conclusions the Debtors now ask this Court to reach. In fact, the contentions proffered by the Debtors are belied by the very terms of the case law they cite and the Purchase Agreement itself. The Recovery Lawsuits and the Settlement Proceeds were assets purchased by the Defendants pursuant to the Purchase Agreement. Thus, the Defendants respectfully request that this Court deny the Debtors' Motion for Summary Judgment, and in turn, grant the Defendant's Motion in its favor.

KL2:2415406.2

Dated: New York, New York,
October 21, 2005

                                      KRAMER LEVIN NAFTALIS &
FRANKEL LLP


By: /s/ Matthew J. Williams
Matthew J. Williams, Esq. (MW 4081)
Jonathan T. Koevary, Esq. (JK 5730)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for Defendants