Hearing Date and Time: November 9, 2005, at 10:00 a.m. (New York Time)
Response Deadline: October 21, 2005

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                                       :
                                                            :   Chapter 11 Case No.
TL ADMINISTRATION CORPORATION,                              :
et al. (f/k/a TWINLAB CORPORATION, et al.),                 :   03-15564 (RDD)
                                                            :
                                                            :   (Jointly Administered)
                    Debtors.                                :
------------------------------------------------------------x
                                                            :
TL ADMINISTRATION CORPORATION,                              :
et al. (f/k/a TWINLAB CORPORATION, et al.),                 :
                                                            :   Adversary Proceeding No.
                    Plaintiffs,                             :
                                                            :   05-02376 (RDD)
        v.                                                  :
                                                            :
IDEASPHERE, INC.,                                           :
AND TL ACQUISITION CORP.                                    :
                                                            :
                    Defendants.                             :
------------------------------------------------------------x

## DEBTORS' RESPONSE TO MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Michael P. Kessler, Esq. (MK 7134)
Gary D. Ticoll, Esq. (GT 1001)
Garrett A. Fail, Esq. (GF 4322)

TL Administration Corporation (f/k/a Twinlab Corporation), TL Administration Inc. (f/k/a Twin Laboratories, Inc.), and TL Administration (UK) Ltd. (f/k/a Twin Laboratories (UK) Ltd.) (collectively, the "Debtors"), submit this response to the memorandum of law in support of the motion filed by Ideasphere, Inc. and TL Acquisition Corp. (collectively, the "Purchaser" or the "Defendants") for summary judgment (the "Defendants' Motion for Summary Judgment") in respect of the complaint (the "Complaint"), dated August 10, 2005, filed by the Debtors and the counterclaim (the "Counterclaim"), dated September 12, 2005, filed by the Defendants in this adversary proceeding.

## PRELIMINARY STATEMENT[1]

By their Complaint, the Debtors seek a declaration that the proceeds of causes of action relating to certain prepetition insurance policies are property of the Debtors' estates. By their Counterclaim, the Defendants seek a declaration that the Defendants purchased the rights to these proceeds. Each side has moved for summary judgment in its favor. See Debtors' Mot. Summ. J.; Defs.' Mot. Summ. J. The Defendants' arguments that the Recovery Lawsuits are not "related to" the Insurance Policies does not withstand scrutiny.

To grant the Defendants' Motion for Summary Judgment and the Counterclaim, the Bankruptcy Court must rely on the Defendants' implausible version of the "intention" of the parties to determine ownership of the right to the proceeds of the Recovery Lawsuits. See Countercl. ¶¶ 10-12; Defts.' Mot. Summ. J. ¶¶ 24, 28, 30. The Debtors dispute the Defendants' version of the "intention" of the parties.[2] However, because the Purchase Agreement is clear and

---

[1] Capitalized terms used herein and not otherwise defined herein have the respective meanings ascribed to them in the Debtors' Motion for Summary Judgment (the "Debtors' Motion for Summary Judgment").

[2] Notably, Defendants failed to annex to Defendants' Motion for Summary Judgment a statement of the material facts as to which Defendant contends there is no genuine issue to be tried. Such a

unambiguous, the intent of the parties can be determined by the Court from the language of the contract. By any plausible construction of the clear and unambiguous words of the contract the Court should grant summary judgment to the Debtors and deny the summary judgment requests by the Defendants.

## RESPONSE

Defendants' only arguments in favor of summary judgment on the Counterclaim are arguments in opposition to the Complaint. As detailed below, these arguments are flawed.

Pursuant to the Purchase Agreement, the Debtors retained "all insurance policies or rights to proceeds thereof" [3] and "any rights, claims or causes of action of [the Debtors] against third parties [that are] related to the [insurance policies or rights to proceeds thereof.]"[4] (emphasis added). The outcome of this adversary proceeding turns on whether or not the Recovery Lawsuits are "related to" the Prepetition Policies.

### 1.   One Can Be Related to Many

Running throughout Defendants' Motion for Summary Judgment is the false notion that "Debtors do not assert ownership of a claim that is 'related to' an underlying asset

---

statement is required by Rule 7056-1 of the Bankruptcy Court's Local Rules (the "Local Rules") and failure to submit such statement constitutes grounds for denial of Defendants Motion for Summary Judgment. See Local R. 7056-1.

[3] Certain "Excluded Assets" were excluded from the sale of substantially all of the Debtors' assets to Defendants. See Purchase Agreement § 2.1 ("'Purchased Assets' shall mean all the assets, properties, rights and claims of every kind and description of each of the Sellers used in the Business (other than Excluded Assets)…"); see also id. § 2.2 ("Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to any Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets."). The enumerated list of "Excluded Assets" includes "all insurance policies or rights to proceeds thereof…" Id. § 2.2(i).

[4] Purchased Assets include "any rights, claims or causes of action of [the Debtors] against third parties, … but exclud[e] those related to the Excluded Assets." Id. § 2.1(p) (emphasis added).

that was defined in the Purchase Agreement as an 'Excluded Asset.'" Defs.' Mot. Summ. J. ¶ 1. Defendants wrongly allege that the "Debtors seek to reclassify a claim related to a non-excluded asset (rights related to brokerage services) by arguing that if the underlying non-excluded asset is somehow related to an Excluded Asset then it too must be considered an Excluded Asset." Id.; see also id. ¶ 24 ("[T]he parties explicitly defined what would be considered Excluded Assets. Rights related to brokerage services were not among the assets so defined... Therefore, claims related to such brokerage services are not claims related to an Excluded Asset.").

Defendants' logic is flawed and disregards the basic concept that one thing may be related to more than one other thing. The Debtors do not seek to "reclassify" anything. Just as a child may be related to both of his parents and all of his siblings, a claim or a lawsuit may be related to both a plaintiff and a defendant, or both a defendant and a cause of action, and the Recovery Lawsuits may be related to both "brokerage services" and the Prepetition Policies. In this case, the Settlement Proceeds are derived from commissions paid by insurers with respect to the placement of coverage on behalf of insured companies like the Debtors, and would not have been paid without the placement of such policies.[5] Defendants admit that the "Recovery Lawsuits were brought against Marsh and Aon in their capacity as insurance brokers," and that

---

[5] In the complaint in its Recovery Lawsuit against Marsh, the New York State Attorney General describes the structure of the insurance industry. See Exhibit A hereto. The complaint describes how a purchaser makes two types of payments: one to a broker as an advisory fee or a commission for locating the best insurer, and another to the chosen insurance company for premiums for the coverage itself. The complaint describes how in addition to the commission paid by a purchaser, brokers sometimes receive another kind of payment, as well, but not one from the purchaser. These so-called "contingent commissions" are paid to the broker by insurance companies pursuant to arrangements generally known as "contingent commission agreements." The Recovery Lawsuits relate to these contingent commissions, not commissions paid directly by the Debtors. The contingent commissions paid to Marsh and Aon were paid by the insurers out of the premium payments paid by the Debtors for the Prepetition Policies. Had the contingent commissions been lower, the Debtors' Prepetition Policies' premiums would have been lower.

NY2:\1581580\05\XWCS05!.DOC\78300.0003                3

the Settlement Proceeds are to be used to "pay restitution to certain parties or their successors who used Marsh or Aon's services to obtain insurance." Id. ¶ 8; see also id. ¶ 25 (admitting that the Recovery Lawsuits were "tangentially related to Excluded Assets"). Clearly, the Recovery Lawsuits and the Settlement Proceeds relate to the Prepetition Policies, and such relationship is in no way "tangential." Indeed, absent the Prepetition Policies, there would be no Settlement Proceeds!

Accordingly, Defendants' arguments relying on their faulty logic and hyperbole must fail. See, e.g., id. ¶ 28 (arguing that under Debtors' construction, "Defendants paid $65 million for nothing").

### 2. **The Parties Selected Broad Language**

Words and phrases in a contract should be given their plain meaning. Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2000) (citing PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996)); In re WorldCom, Inc., 296 B.R. 115, 121 (Bankr. S.D.N.Y. 2003).

The Second Circuit has determined that "the ordinary meaning of the broad term 'related to' ... is clear and unambiguous":

> The term 'related to' is typically defined more broadly [than 'arising out of'] and is not necessarily tied to the concept of a causal connection. Webster's Dictionary defines 'related' simply as 'connected by reason of an established or discoverable relation. The word 'relation,' in turn, as 'used especially in the phrase 'in relation to,'' is defined as a 'connection' to or a 'reference' to. Courts have similarly described the term 'relating to' as equivalent to the phrases 'in connection with' and 'associated with,' and synonymous with the phrases 'with respect to,' and 'with reference to,' and have held such phrases to be broader in scope than the term 'arising out of.'

Coregis Ins. Co. v. Am. Health Found., Inc., 241 F.3d 123, 128-29 (2d Cir. 2001) (citations omitted); see also Vermont Pure Holdings, Ltd. v. Descartes Sys. Group, Inc., 140 F. Supp. 2d

331, 334 (D. Vt. 2001) (citing Coregis for the proposition that "the ordinary meaning of the term 'related to' was clear, unambiguous, and quite broad.").

The Bankruptcy Court has already found that the "Purchase Agreement was negotiated, proposed and entered into by the Debtors and [Defendants] without collusion, in good faith, and from arm's length bargaining positions." See Order Approving Purchase Agreement, Oct. 31, 2003 ¶ J. The subsections of Section 2.1 of the Purchase Agreement contain various terms and demonstrate the parties' awareness of their choice of language. See Purchase Agreement § 2.1(a) ("arising out of or in connection with any Excluded Asset"), (c) ("other than Excluded Products"), (d) ("in connection with or relating to any Excluded Assets"), (i) ("solely related to … any Excluded Asset"), (m) ("pertaining to any Excluded Asset"), (p) ("related to the Excluded Assets").

Accordingly, the broad term "related to" selected by the parties for Section 2.1(p) should be given its plain meaning.

3.   **Defendants' Examples Support the Debtors' Arguments**

Section 2.1 of the Purchase Agreement generally provides for the transfer to Defendants of the Purchased Assets, "including" those assets listed in subsections (a) through (p). See Purchase Agreement § 2.1. Section 2.1(p) lists "any rights, claims or causes of action of [the Debtors] against third parties, … but excluding those related to the Excluded Assets." Id. § 2.1(p).

Defendants argue that because the word "including" is defined so as "not to be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it," the language "excluding those related to the Excluded Assets" cannot limit the "general transfer provision set forth in Section 2.1." Defs.' Mot. Summ. J. ¶¶ 27-28

("The Debtors' attempt ... missed the mark because the parties contractually agreed that the illustrative examples ... were <u>not</u> meant to limit the earlier general transfer provisions.").

Defendants' argument is wrong. The fact that the word "including" does not "limit any general statement that it follows <u>to</u> the specific or similar items or matters immediately following it" does not preclude the specific items or matters immediately following the word "including" from otherwise limiting the general provision preceding it. Defendants' quote of Section 2.1(a) as another "illustrative example" belies their argument:

> all accounts receivable <u>other than</u> any accounts receivable and any other rights to payments arising out of or in connection with any Excluded Asset or the sale or distribution of Excluded Products.

<u>See</u> <u>id.</u> ¶ 26 (emphasis added). Defendants cannot dispute the fact that "accounts receivable and rights to payments arising out of or in connection with any Excluded Asset" were excluded from the Purchased Assets. Defendants' contention that the "parties' [sic.] expressly enumerated all exceptions to the transfer in the definition of 'Excluded Assets'" is incontrovertibly wrong. <u>Id.</u> ¶ 28. Subsections (c), (d), (i), and (m) of Section 2.1 each contain exclusions relating to Excluded Assets. <u>See</u> Purchase Agreement § 2.1(c) ("all raw materials, supplies, manufactured goods ... <u>other than Excluded Products</u>"), (d) ("all deposits ... <u>other than deposits ... in connection with or relating to any Excluded Asset</u>"), (i) ("all Documents ... <u>but excluding ... any Documents solely related to ... any Excluded Asset</u>), (m) ("all rights of [the Debtors] under or pursuant to all warranties ... <u>other than any warranties... pertaining to any Excluded Assets</u>) (emphasis added). Thus, there is no analogy between the Purchase Agreement and the contract in Defendants' description of <u>Greylock Global Opportunity Master Fund Ltd v. Province of Mendoza</u> where four exceptions were listed in one section and a fifth, "narrowly tailored exception" was listed elsewhere in the contract. <u>See</u> Defs.' Mot. Summ. J. ¶ 28. Section 2.1 of

the Purchase Agreement consistently uses references to the Excluded Assets (which are defined in the successive section, Section 2.2) to limit the definition of "Purchased Assets."

Under Defendants' theory, each of the carve-outs in Section 2.1 would be meaningless. Defendants' theory would violate "a fundamental rule of contract interpretation: i.e., when interpreting a contract, the entire contract must be considered so as to give each part meaning." Brooke Group v. JCH Syndicate, 663 N.E.2d 635, 637 (N.Y. 1996) (citing Weiss v. Weiss, 418 N.E.2d 377, 379 (N.Y. 1981); Laba v. Carey, 29 N.Y.2d 302, 308 (1971)[6]; Cruden v Bank of N. Y., 957 F2d 961, 976 (2d Cir. 1992)); see also Finkel v. St. Paul Fire & Marine Ins. Co., 2002 U.S. Dist. LEXIS 11581, * 8-10 (D. Conn. 2002).[7]

### 4. **Defendants' Intention Was to Avoid Successor Liability**

The Counterclaim and Defendants' Motion for Summary Judgment ask the Bankruptcy Court to divine the intent of the parties from Section 8.13 of the Purchase Agreement, a section entitled "Plan of Reorganization." See Countercl. ¶ 10; Defs.' Mot. Summ. J. ¶ 30. Defendants' summarized that section as "obligating the Debtors to use their best efforts to ensure that any plan of reorganization provides that 'existing policies will continue to be used to pay any product liability claims.'" Not coincidentally, Defendants' summary excluded two

---

[6] "Our conclusion is nothing more than an application of the rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." (citations omitted).

[7] "If the words ... are plain and unambiguous, the established rules for the construction of contracts apply; the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning; and courts cannot indulge in a forced construction, ignoring provisions or so distorting them as to accord a meaning other than that intended by the parties. Thus, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity..... Each and every sentence, clause, and word of a contract ... should be given operative effect. Since it must be assumed that each word ... is intended to serve a purpose, every term will be given effect if that can be done by any reasonable construction.... The question is not what intention existed in the minds of the parties but what intention is expressed in the language used." (citations and quotations omitted).

other (of the three total) provisions the Debtors' plan was to include: one "provid[ing] a release of the [Defendants] from any product liability or similar claims pursuant to Section 1141(c) of the Bankruptcy Code," and one "enjoin[ing] any suits brought against the Purchasers in connection with such claims." Purchase Agreement § 8.13. The omitted provisions explain why Section 2.1 of the Purchase Agreement excludes from the Purchased Assets many assets "arising out of, "in connection with", "pertaining to," "solely related to," and "relating to" any Excluded Asset.

Defendants argue "the particular reason why the [Prepetition Policies] were specified as Excluded Assets" in Section 2.2(i) was "to provide a mechanism for the Debtors to gain access to the proceeds of insurance policies and use such proceeds towards paying Ephedra-related and other claims." Defs.' Mot. Summ. J. ¶ 30. Indeed, that may have been one reason the Debtors had for excluding the Prepetition Policies from the assets sold to Defendants.[8] However, the exclusion of the Prepetition Policies and proceeds thereof was sufficient in itself to ensure that the proceeds would be available to pay ephedra-related claims. Defendants conveniently forget that the issue before the Court is the exclusion from transfer to the Purchasers of claims and causes of action <u>related to</u> the Prepetition Policies. The parties agreed to that language, and the Debtors' ability to access policy proceeds for payment of claims has nothing to do with that provision, or other provisions of the Purchase Agreement that exclude from the Purchased Assets many assets "arising out of, "in connection with", "pertaining to," "solely related to," and "relating to" any Excluded Asset.

The Bankruptcy Court has found:

---

[8] The Debtors' Plan was eventually funded, in part, by contributions from the Debtors' insurers, and provided, in other parts, for certain ephedra-related claims to be paid out of insurance proceeds. <u>See</u> Plan §§ 4.3, 4.4, 5.3.

> Ideasphere would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby ... except as otherwise provided for in the Purchase Agreement, free and clear of all Interests of any kind or nature whatsoever, or if Ideasphere would, or in the future could, be liable for any of the Interests including ... any products liability or similar Claims ... including, without limitation, <u>any Claims **related to** the Excluded Assets</u>.

Order Approving Purchase Agreement, Oct. 31, 2003 ¶ P (emphasis added). Defendants were concerned about successor and vicarious liability for the Excluded Assets in particular. At the time of the sale, a transfer of the Debtors' rights, claims or causes of action against third parties that were related to the Excluded Assets would have increased the risk of Defendants' future liabilities. Accordingly, Defendants bargained for and received the broadest possible releases from liabilities related to the Excluded Assets. Nearly two years after the sale was consummated, and months after the Debtors' Plan released them from and enjoined claims against them relating to the Excluded Assets, Defendants see the Recovery Lawsuits as an opportunity for gain with no risk of exposure for liability. Defendants' Counterclaim is simply an opportunistic attempt to re-trade a deal with the benefit of future knowledge. Defendants' attempt should be denied.

### 5. **Defendants' Have Not Met the Standard for Summary Judgment**

Under Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Rules 7056 and 9014(c) of the Federal Rules of Bankruptcy Procedure, summary judgment may only be entered when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

As set forth above, to grant the Defendants' Motion for Summary Judgment and the Counterclaim (in addition to determining that the language of the Purchase Agreement does not on its face exclude the Settlement Proceeds from transfer to Defendants), the Bankruptcy

Court would have to rely on the Defendants' version of the "intention" of the parties to determine ownership of the right to the proceeds of certain causes of action. See Countercl. ¶¶ 10-12; Defs.' Mot. Summ. J. ¶¶ 24, 28, 30. In response, the Debtors maintain first that "[w]hen an agreement's terms are clear and unambiguous, there is no need to resort to other means of interpretation to determine their meaning." Tucker Leasing Capital Corp. v. Marin Med. Mgmt., 833 F. Supp. 948, 956 (E.D.N.Y. 1993); see also Finkel, 2002 U.S. Dist. LEXIS at *8-10. The language of the Purchase Agreement "excluding those [rights, claims or causes of action of the Debtors against third parties] related to the Excluded Assets" is clear and unambiguous and there is no need to resort to parole evidence to divine the intent of the parties. Second, the Debtors dispute the Defendants' implausible version of the "intention" of the parties. See Debtors' Answer to Countercl. ¶ 10-12; see also § 4 supra (citing both language in the Purchase Agreement and findings of the Bankruptcy Court). Under the governing standards, Defendants are not entitled to summary judgment in their favor on the Complaint or the Counterclaim.

       On the other hand, summary judgment is appropriate on the Debtors' Motion for Summary Judgment because the language of the Purchase Agreement is plain and unambiguous.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied, Defendants' Counterclaim should be dismissed, and Debtors' Motion for Summary Judgment should be granted.

Dated: New York, New York
October 21, 2005

Respectfully submitted,

*/s/ Michael P. Kessler*

Michael P. Kessler, Esq. (MK 7134)
Gary D. Ticoll, Esq. (GT 1001)
Garrett A. Fail, Esq. (GF 4322)
WEIL, GOTSHAL & MANGES LP
767 Fifth Avenue
New York, New York 10153-0019
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Debtors