KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Matthew J. Williams, Esq. (MW 4081)
Jonathan T. Koevary, Esq. (JK 5730)

Attorneys for Ideasphere, Inc. and TL Acquisition Corp.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————x
                                            :
**In re:**                                  :        **CHAPTER 11**
                                            :
**TL ADMINISTRATION CORPORATION et al.** :
**(f/k/a/ TWINLAB CORPORATION et al.),**    :
                                            :
                                            :        **Case No. 03-15564 (RDD)**
              **Debtors.**                  :
————————————————————————x
                                            :
**TL ADMINISTRATION CORPORATION et al.** :
**(f/k/a/ TWINLAB CORPORATION et al.),**    :        **Adv. No. 05-02376 (RDD)**
                                            :
              **Plaintiffs,**               :
                                            :
              **- v. -**                    :
                                            :
**IDEASPHERE INC.,**                        :
**AND TL ACQUISITION CORP.**                :
**Defendants.**                             :
————————————————————————x

**DEFENDANTS' RESPONSE TO DEBTORS'**
**SUPPLEMENTAL BRIEF IN SUPPORT OF DEBTORS'**
**MOTION FOR SUMMARY JUDGMENT**

Defendants Ideasphere, Inc. and TL Acquisition Corp. (collectively

"Defendants"), by their attorneys, Kramer Levin Naftalis & Frankel LLP, hereby submit

this response in opposition to Plaintiffs TL Administration Corp., TL Administration Inc.,

and TL Administration UK's (collectively, the "Debtors") Supplemental Brief In Support

of Debtors' Motion for Summary Judgment (the "Debtors' Supplement").[1]

## PRELIMINARY STATEMENT

Pursuant to this Court's request, the parties to this Adversary Proceeding

filed supplemental briefs on the question of whether the Recovery Lawsuits and the

Settlement Proceeds constitute "assets used in the Business" within the meaning of the

Purchase Agreement.  In support of their position, the Debtors cited the same two

decisions raised by the Court *sua sponte* at the November 9 oral argument: *Bank of New*

*York v. Janowick*, 2005 U.S. Dist. LEXIS 16728 (W.D. Ky. Aug. 10, 2005) and

*Execulines Ltd. v. Tel-America of Salt Lake City, Inc.*, 826 P.2d 1333 (Idaho App. 1991).

As the germane issue in these cases had not previously been raised by the

parties prior to the oral argument, the Court necessarily did not have benefit of a full

briefing of this issue in the context of the matter at hand.  The Debtor's Supplement has

done nothing to aid the Court in this regard, as once again the Debtors merely provide a

cursory review of the facts in those cases and then presumptively conclude that the

holdings are binding in this matter without offering a thorough or accurate analysis of the

factual underpinnings of those holdings in comparison to facts currently before the Court.

As shown in Defendants' Supplemental Brief In Support of Defendants' Motion for

Summary Judgment (the "Defendants' Supplement"), such an analysis reveals that both

of these cases are pertinently distinguishable and that the fundamental precepts upon

---

[1] The parties to this adversary proceeding cross-moved for summary judgment on October 14, 2005.
Capitalized terms used herein and not otherwise defined herein have the respective meanings ascribed to
them in the Defendants' Memorandum of Law in Support of their Motion for Summary Judgment dated
October 14, 2005 (the "Defendants' Motion").

which these courts reached their decisions actually weigh in favor of the Defendants in

this matter.

### A.        Bank of New York and Execulines do not Support Debtors

The Debtors' Supplement is based from the outset on a flawed premise:

"By result of the words 'used in the Business,' the Purchased Assets are limited to the

assets, properties, rights, and claims – including 'any rights, claims or causes of action of

[the Debtors] against third parties' – *that were used in the manufacturing and marketing*

*of nutritional products*." *See* Debtors' Supplement at 1-2 (emphasis added).  The Debtors

thereafter cite to *Bank of New York* wherein a similarly narrow definition of "Business"

was at issue.  As set forth in Defendants' Supplement, however, this is *not* the definition

of Business that was adopted by the parties in this case.  Rather, the parties chose to

incorporate a preamble to the definition of "Business" in the Purchase Agreement which

provided that such term was to be deemed as "including" and, thus not being limited to,

the specific descriptions that followed.

As previously briefed, the parties also expressly defined the meaning of

"including" as used in the Purchase Agreement to have the broadest possible scope.  As

Debtors have correctly cited, the law requires that "[e]ach and every sentence, clause, and

word of a contract should be given operative effect."  *See* Debtors Reply at 9.  While

Debtors have conveniently edited this operative word from their definition of "Business,"

the fact remains that the Purchase Agreement provides a broader definition of Business

than that presented to the Court in *Bank of New York*.  As set forth in Defendants'

Supplement, the brokerage services at issue were a critical component of the Debtors'

business and continue to be so for the Defendants' business.  Viewing the facts of the

present matter, these critical services fall within the parties' broad definition of Business,

and therefore, *Bank of New York*, which reached a different conclusion based on different

facts, dictates a finding for the Defendants in this case.

      The Debtors have not only omitted crucial contractual language, in their

effort to liken the present case to *Bank of New York* they have also made two material

misstatements of fact to improperly diminish the role of the relevant brokerage services

as critical to the Debtors' Business.   First, the Debtors incorrectly state that the

brokerage services were provided only in relation to Excluded Products.  Specifically,

after noting that ephedra was an "Excluded Product" under the Purchase Agreement, *see*

Debtors' Supplement at 2-3, the Debtors mistakenly argue, "It is undisputed that the

Prepetition Policies are Excluded Assets relating to *Excluded Products*."  *See* Debtors'

Supplement at 5 (emphasis added).  This simply a misstatement of fact.  The Marsh and

AON brokerage services at issue in the Recovery Lawsuits were provided to assist the

Debtors in gaining access not only to insurance markets for ephedra product liability

coverage but also to general liability, employers liability, property, workers

compensation and other markets as well.

      Indeed, in 2002 and 2003, the product liability policies brokered by AON

expressly *excluded* coverage for Debtors' ephedra products.  The Defendants can only

surmise that Debtors' misstatement was driven by this fact and the resulting fact that

Debtors engaged the services of Marsh in those years to find markets that would provide

such coverage for Debtors' ephedra products.  However, while Marsh was able to broker

policies for Debtors that would cover and serve as the primary layer of insurance for

ephedra products, these policies also sat as the excess layer umbrella policies on top of

4

the policies brokered by AON as primary policies for the Debtors non-ephedra products business and other general business coverage requirements, such as general, automotive and employers liability.[2] Again, this breadth and scope of the services provided by both Marsh and AON was the result of, and indicative of, the critical need for access to insurance markets for numerous aspects of Debtors' Business.

The Debtors' second pertinent misstatement of fact was again made in an improper attempt to liken the facts at Bar to those in *Bank of New York*, wherein the court made special note of the seller's "long expired pension plan." *See* Debtors' Supplement at 5. Specifically, the Debtors argue that "lawsuits against brokers relating to insurance policies that *expired prepetition*" cannot be Purchased Assets. *See id.* at 2 (emphasis added). Again, this is contrary to the facts. The Debtors filed their bankruptcy petition on September 4, 2003. As noted in Exhibit B, the policy year for the Debtors in 2003 ran from December 31, 2002 to December 31, 2003. The Debtors did not consummate their asset sale transaction with the Defendants until December 19, 2003. Until that time, the Debtors did not cancel any policy of insurance, as such was necessary for the continued operation of the Debtors' business during the Section 363 auction period and as a condition precedent to thereafter closing with the Defendants.[3]

---

[2] *See* Exhibit A (Marsh brokered Commercial Umbrella Declarations for policy period December 31, 2001 to December 31, 2002 (including Endorsement No. 1 "Schedule of Underlying Insurance"), and Exhibit B (Marsh brokered Excess Products Liability Policy for policy period December 31, 2002 to December 31, 2003 (including "Endorsement No. 1 "Schedule of Retained Limits," noting excess coverage of, among other things, "Non-Ephedra Products"). Thus, while the Marsh services provided access to coverage for ephedra policies, ephedra products were not the only aspect of the business covered by the policies Marsh brokered.

[3] As a side note, all of Debtors pre-petition product liability policies until policy year 2001 were "occurrence" based policies that continued (and continue) to provide coverage for any claim brought at any time so long as the occurrence upon which the claim is based occurred in the applicable policy period.

The Debtors are simply wrong in attempting to cast the brokerage services at issue in this matter as a function tied strictly to Excluded Products or expired contracts of the Debtors' former business.  Indeed, as set forth in Defendants' Supplement, the reason that the Debtors were required to maintain all insurance policies post-petition is the very fact that then, as now, the acquisition of insurance is not only "in the Business" of Debtors (and now Defendants), but it is critical to the Business.  As a practical matter, to effectively gain access to today's insurance markets, the use of insurance brokers is essential.  Notwithstanding the claims in the Recovery Lawsuits, Marsh and AON are two of the largest, and generally recognized as the premier, providers of this service in the United States.  As set forth in Defendants Supplement, the Defendants purposefully took from the Debtors through the Purchase Agreement, the right to bring causes of action against service providers that Defendants would need to engage in the continued operations of the Business.  Marsh and AON are exactly such providers.

In this regard, though not misstated, the Debtors raise a third argument that is simply misplaced.  The Debtors note that the "Recovery Lawsuits were brought by third parties against Debtors' insurance brokers . . . ."  *See* Debtors' Supplement at 3.  The fact that the suits were brought on behalf of a number of claimants by third-party attorneys general in their role as *parens patriae* is of no moment.  The right to bring these suits was, as set forth above, purposefully taken from the Debtors pursuant to the Purchase Agreement, and the fact that the suits were initiated by a third-party does not revert to Debtors a right to proceeds from suits that under the terms of the Purchase Agreement they would not be able to bring themselves.

6

With regard to the *Execulines* case, the Debtors Supplement again provides merely a cursory recitation of the finding, focusing on the fact that the telephone credit at issue in that case "was unknown and, indeed, not in existence at the time of the sale." *See* Debtors' Supplement at 5. Debtors conspicuously fail to acknowledge that while the court in *Execulines* relied heavily on the fact that the agreement at issue therein did not provide for the transfer of unanticipated and unaccrued rights, the Purchase Agreement in the present case expressly addressed such unvested rights *and transferred them to the Defendants*. Moreover, the Debtors omit any reference to the fact that the other basis of the court's ruling in *Execulines* was a finding that the explicit language of the underlying agreement that addressed telephone credits for 1985, though not directly referencing the unanticipated credit for 1986, evidenced the parties' intent on the subject and was determinative of the treatment of the newly discovered credit. No such provision exists in the present matter, and, to the contrary, as set forth in all of the Defendants' previous filings, the language of both the relevant provisions and the totality of the Purchase Agreement dictates a different finding in this matter, in favor of the Defendants.

### B.  Section 8.9, if Applicable, is Dispositive in Favor of Defendants

As an initial matter, the Defendants do not believe that it is necessary for the Court to reach Section 8.9 of the Purchase Agreement. The Debtors have admitted, and it is indisputable, that the Recovery Lawsuits and the Settlement Proceeds are not themselves Excluded Assets. As set forth herein and in Defendants' Supplement, these causes of action are in fact "in the Business" as that term is defined in the Purchase

7

Agreement.  As non-Excluded Assets that are in the Business, these assets are by

definition Purchased Assets and belong to the Defendants.  The Court need go no further.

Though Debtors argue that even if these assets are otherwise Purchased

Assets, they nevertheless are Excluded Assets because they are "related to" Excluded

Assets, the Defendants have shown at length that this position is not supported by the

Purchase Agreement or the applicable case law.  The Recovery Lawsuits are suits against

third party brokerage services and the outcome of both the Recovery Lawsuits and of this

litigation between the parties has absolutely zero effect on the Debtors' insurance

policies, the proceeds thereof (the Excluded Assets on which Debtors rest their

argument), or the purpose for which such policies were excluded for the benefit of the

Debtors (to be used for contingent liabilities of the estate, including those related to

ephedra).

Even if the Debtors' "related to" argument is to be addressed, it must fail

in the face of Section 8.9 of the Purchase Agreement, which provides:

> If Sellers or any of their respective Affiliates, or any other Person
> acting for or in concert with any of the foregoing Persons, shall
> receive any money, check, note, draft, instrument, payment or
> other property *relating to or as proceeds of the Purchased Assets*
> or the Assumed Liabilities or any part thereof, each such Person
> shall receive all such items in trust for, and as the sole and
> exclusive property of, Purchasers and, immediately upon receipt
> thereof, shall notify Purchasers in writing of such receipt and shall
> remit the same (or cause the same to be remitted) in kind to
> Purchasers in the manner specified by Purchasers.

Purchase Agreement § 8.9.  Again, as the Recovery Lawsuits and Settlement Proceeds

are not themselves Excluded Assets, upon a finding that these causes of action regarding

brokerage services are "in the Business," a finding that Defendants respectfully submit is

KL2:2420047.1

dictated in this case, then as non-Excluded Assets in the Business, these assets are

conclusively Purchased Assets.

In all of their previous filings the Debtors did not find it necessary to

strenuously debate this issue as they were content to argue that without exception "related

to" must be given so broad a meaning that, even if otherwise Purchased Assets, the

Recovery Lawsuits must become Excluded Assets because they are related to "insurance

policies or proceeds thereof."  Indeed, as they championed such a broad reading of

"related to," the Debtors felt no need to shy away from acknowledging that the Recovery

Lawsuits and Settlement Proceeds were in fact related to Purchased Assets, stating:

"Defendants' logic is flawed and disregards the basic concept that one thing may be

related to more than one other thing.  The Debtors do not seek to "reclassify" anything.

Just as a child may be related to both of his parents and all of his siblings, a claim or

lawsuit may be related to both a plaintiff and a defendant, or both a defendant and a cause

of action, and the Recovery Lawsuits may be related to both 'brokerage services' and the

Prepetition Policies."  *See* Debtors' Response at 3.

Not surprisingly, the Debtors suddenly seem less enthused to trumpet the virtues

of "related to" when it comes to Section 8.9, preferring instead to offer more narrowly

tailored examples of what the application of that term must mean in this provision.  The

Defendants do not need to change what they have argued from the first:  The law does

not simply take "related to" in the abstract, but rather requires an analysis of the facts to

determine whether, in the context the underlying agreement, something is or is not

"related to" something else in the legal sense.

KL2:2420047.1

Having made the requisite determination that the Recovery Lawsuit causes of action are in the Business that is necessary to reach Section 8.9, then there is no doubt that these causes of action, which arise, refer to and effect solely Purchased Assets, are, in the context of the Purchase Agreement (and as admitted by Debtors), related to Purchased Assets.  Section 8.9, therefore, dictates that these assets are property of the Defendants. For the reasons set forth at great length by the Defendants in previous filings, in the context of the parties' Purchase Agreement, the Recovery Lawsuits and Settlement Proceeds simply are not related to any Excluded Asset.  Every applicable provision of the Purchase Agreement dictates that these assets are Purchased Assets belonging to the Defendants, and the Debtors have been left only the "related to" argument.  As relates to the assets at issue, this argument is without merit, and in any case would create an unacceptable conflict with Section 8.9 of the Purchase Agreement, which based on all the facts and applicable provisions of the Purchase Agreement dictates a finding for the Defendants.

## CONCLUSION

As demonstrated by the Defendants' Supplement, the causes of action in the Recovery Lawsuits are assets "used in the Business" of the Debtors within the meaning of the Purchase Agreement.  As such, these causes of action are Purchased Assets.  Pursuant Section 8.9 all proceeds related to these Purchased Assets are property of the Defendants, and the tangential, colloquial relation upon which Debtors rest, while not availing in any case, cannot be heard to contravene this mandate of the Purchase Agreement.

KL2:2420047.1

Dated: New York, New York,
November 21, 2005

KRAMER LEVIN NAFTALIS &
FRANKEL LLP

By: /s/ Matthew J. Williams
Matthew J. Williams, Esq. (MW 4081)
Jonathan T. Koevary, Esq. (JK 5730)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for Defendants

KL2:2420047.1