UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re                                            :     Chapter 11

TL ADMINISTRATION CORPORATION, et al.,
(f/k/a TWINLAB CORPORATION et al.,),             :     Case Nos. 03-15564 (RDD)

                Debtors.       :     (Jointly Administered)
------------------------------------------------------------------x

TL ADMINISTRATION CORPORATION, et al.            :
(f/k/a TWINLAB CORPORATION, et al.),
                                                 :
                Plaintiffs,    Adversary Proceeding No.
                                                 :     05-02376 (RDD)
      -v-
                                                 :
IDEASPHERE, INC. and
TL ACQUISITION CORP.,                            :

                Defendants.    :
------------------------------------------------------------------x

Appearances:

WEIL, GOTSHAL & MANGES, by Michael P. Kessler and Gary Ticoll, for
Plaintiffs/Debtors

KRAMER LEVIN NAFTALIS & FRANKEL LLP, by Matthew J.
Williams and Jonathan T Koevary, for Defendants

### MEMORANDUM OF DECISION AND ORDER ON
### CROSS-MOTIONS FOR SUMMARY JUDGMENT

ROBERT D. DRAIN, United States Bankruptcy Judge

       The parties to this adversary proceeding filed for summary judgment

under Fed. R. Civ. P. 56(a) and (b), respectively, as incorporated by Fed. R. Bank. P.

7056.  They dispute the interpretation of the Asset Purchase Agreement dated as of

September 4, 2003 (the "APA") pursuant to which defendants Ideasphere, Inc. and TL

Acquisition Corp. (together, the "Defendants" or the "Purchasers") acquired substantially

all of the assets of the above-captioned debtors and debtors in possession (the "Debtors" or the "Sellers").  Specifically, they disagree whether the purchased assets include rights to restitution from two of the Debtors' insurance brokers pursuant to agreements under which the brokers settled litigation against them brought by the Attorney General of the State of New York.[1]  Although the brokers' allegedly wrongful activity occurred before the date of the APA, the Attorney General began his lawsuits well after the APA closed, and neither the Debtors nor the Defendants anticipated the right to receive several hundred thousand dollars of restitution payments.  The issue, then, is to determine, in the absence of any specific reference in the APA to these unexpected rights, how the APA provided for them; are the Debtors' rights to restitution purchased assets, or not?

## Discussion

This Court has jurisdiction over the cross-motions under 28 U.S.C. § 1334(b) because they pertain to the interpretation and implementation of the APA that was previously approved by the Court.  This core proceeding, *see* 28 U.S.C. § 157(b)(2)(A) and (O), is one of the types of proceedings with respect to which the bankruptcy reference was not withdrawn in these chapter 11 cases by the District Court's order of March 22, 2005 (Rakoff, J).

A motion for summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

---

[1] The New York Attorney General's complaint alleged that the insurance brokers had engaged in anticompetitive and fraudulent practices, including "bid rigging" to inflate payments for their brokerage services.

2

nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although all reasonable inferences should be drawn in the nonmoving party's favor, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), to defeat a properly supported motion for summary judgment the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586; it must present "significant probative supporting evidence" that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"Under New York law[2] a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992). "Under New York law, . . . if a contract is unambiguous on its face, its proper construction is a question of law." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). A court should not look beyond the confines of the contract if its relevant provisions are plain and unambiguous. *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989); *Shugrue v. Pension Benefit Guar. Corp.* (*In re Ionosphere Clubs, Inc.*), 147 B.R. 855, 861-62 (Bankr. S.D.N.Y. 1992). Giving the words and phrases of a contract their plain meaning, a court should find contractual provisions ambiguous only if they are reasonably susceptible to more than one interpretation. *Krumme v. Westpoint Stevens, Inc.*, 238 F.3d 133, 139 (2d Cir. 2000); *Burger King v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir. 1990). "Contract language is unambiguous if it has a definite and precise meaning, unattended by danger

---

[2] The parties agree that New York law applies. See APA § 13.6: "This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State."

3

of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Metropolitan Life*, 906 F.2d at 889 (internal quotation and citation omitted). "Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Id.*

As noted, the APA did not address with specificity the Sellers' rights to restitution payments obtained under the Attorney General's settlements. One therefore must examine the sections of the APA that generally define what the Purchasers did and did not acquire.

The first such provision defines the "Purchased Assets."

> 'Purchased Assets' shall mean all the assets, properties, rights and claims of very kind and description of each of the Sellers *used in the Business (other than Excluded Assets), whether* real or personal, tangible or *intangible*, vested or unvested, *contingent or otherwise*, wherever located and whether existing now or hereinafter acquired, *as the same shall exist on the Closing Date*, whether or not any of such assets, properties, rights or claims have any value for accounting purposes or are carried or reflected on or specifically referred to in books or financial statements of Sellers.

APA § 2.1 (emphasis added). It is plain from this definition that the "Purchased Assets" are those assets "used in the Business," unless they are "Excluded Assets," although they may be "intangible" and "contingent" as of the Closing Date and need not be reflected on the Sellers' books or financial statements.

Section 2.1 does not end with the language quoted above, however. It lists a number of specific categories of assets that are included[3] within the "Purchased Assets" definition. Three are relevant:

---

[3] From the parties' use of the word "including" to introduce these categories, it is clear that they intended the definition of "Purchased Assets" not to be limited to these specific types of assets. "The word

4

>(a) all accounts receivable *other than* any accounts receivable and *any other rights to receive payments arising out of or in connection with any Excluded Asset* or the sale or distribution of Excluded Products;
>
>\* \* \*
>
>(o) all goodwill and other *intangible assets associated with the Business*, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property; and
>
>(p) *any rights, claims or causes of action of Sellers against third parties relating to the Business* or the Purchased Assets arising out of events occurring on or prior to the Closing Date, *but excluding those related to the Excluded Assets*. . . .

APA §§ 2.1(a), (o), (p) (emphasis added).  As with the general definition of the "Purchased Assets," these three more specific descriptions of "Purchased Assets" include "intangible assets . . . associated with the Business" (APA § 2.1(o)) and "rights, claims or causes of action . . . against third parties relating to the Business" (APA § 2.1(p)); and they exclude "rights to receive payments arising out of or in connection with any Excluded Asset" (APA § 2.1 (a)) and "rights, claims or causes of action . . . related to the Excluded Assets" (APA § 2.1(p)).

The APA defines the Sellers' "Business" in relevant part as follows:

>'Business' means *the business of Sellers, including the manufacturing and marketing of nutritional products*, including vitamins, minerals, supplements, herbals and tea, and diet, energy and sports nutrition products including powders, bars, drinks and other health products sold through health and natural food stores, national and regional drug store chains, supermarkets, mass merchandise retailers, military post exchanges and other channels. . . .

APA § 1.1 (emphasis added).

---

'including' or any variation thereof means 'including, without limitation' and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it." APA § 1.3.

5

Confirming that "Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to any Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets," the parties defined the "Excluded Assets" as "all assets, properties, interests and rights of Sellers other than the Purchased Assets." APA § 2.2. Then, as with the definition of "Purchased Assets," they listed several categories of Excluded Assets specifically included within the broader definition of "Excluded Assets," including, as relevant to the present dispute,

> (i) all insurance policies or rights to proceeds thereof relating to the assets, properties, business or operations of Sellers, except as otherwise agreed among Purchasers and Sellers prior to the Closing.

APA § 2.2(i).

Taking the foregoing provisions together, it is clear that the Purchasers were buying only a *business*, with the further exception of the Excluded Assets. APA § 2.1; see also APA § 5.6(b), in which the Sellers represent:

> *The Purchased Assets constitute all of the properties and assets relating to or held for use in connection with the Business, other than the Excluded Assets.* There are no material assets or properties used primarily in the operation of the Business and owned by a third party that will not be leased or licensed to Purchasers under current leases or license agreements.

APA § 5.6(b) (emphasis added). This is different, of course, than drafting the APA to provide that the Purchasers were buying *all* of the Sellers' assets with the exception of specifically excluded assets, which is not what the definitions provide.

Similar contract language – in which the parties defined the purchased assets as those "used or intended for use in or in connection with the Business" -- was recently found to express the parties' intention to exclude from an acquisition a similarly

6

unanticipated asset, the right to receive proceeds resulting from the "demutualization" of an insurance company that had previously issued annuities to the seller. *Bank of New York v. Janowick*, 2005 U.S. Dist. LEXIS 16728 (W.D. Ky. August 10, 2005). The asset purchase agreement in *Janowick* had not specifically addressed this asset, although the parties' definition of the purchased assets, like section 2.1(p) of the APA, included, "all claims, causes of action, choses in action [and] rights of recovery . . . pertaining to, or arising out of, the Business. . . ." *Id*. at 9.

Because the parties had defined the "Business" in which the purchased assets had to be "used" as "the business of converting alumina into primary aluminum . . . and the sale of such primary aluminum," *id*., the *Janowick* court concluded that the rights at issue "do not constitute 'Assets,'" particularly given that the seller had continuing responsibility for the ultimate source of the funds (a pension plan).[4] *Id*. at 9-10. S*ee also Execulines Ltd. v. Tel-America of Salt Lake City, Inc.*, 121 Idaho 621, 826 P.2d 1333, 1334-35 (Ida. App. 1991), in which the court determined that a credit for pre-closing telephone service was not included in the acquired assets, which the parties had defined as "all of the assets and property of [seller] used in its business." *Execulines* reached this result notwithstanding that the only assets that the agreement specifically excluded from the acquired assets were a particular account receivable, a bank account and a possible billing credit for a different pre-closing year. *Id.*, 826 P.2d at 1335-36.

Consistent with the foregoing cases and the APA's plain language, the Debtors' rights to restitution under the brokers' settlement agreements with the New York Attorney General are not assets "used in the [Sellers'] Business" of manufacturing and marketing nutritional products, APA § 1.1, and, thus, are not "Purchased Assets."

---

[4] The seller had invested the surplus assets of the pension plan in the annuities. *Id*.

7

This is not because such rights or claims were inchoate and contingent when the APA closed, because the definition of "Purchased Assets" does not exclude assets on the basis that they were intangible or contingent on the Closing Date, as long as they would be "used in the Business." APA § 2.1. They are excluded, instead, because they were not "used in the [Sellers'] Business," unless one reads the definition of "Business" so broadly as to encompass not what APA § 1.1 says the "Business" is (the "manufacturing and marketing of nutritional products"), but, rather, the ownership of all of the Debtors' assets. Such an interpretation, however, would render the APA's emphasis on the Purchased Assets being used in the "Business" superfluous. *See Brooke Group v. JCH Syndicate*, 87 N.Y.2d 530, 534 (1996); *Cruden*, 957 F.2d at 976 (applying rule of construction that a contract should not be interpreted so as to render certain of its provisions superfluous). That is, if the parties had intended such a result, they simply would have provided, instead, that the Purchasers were buying *all* of the Sellers' assets with the exception of certain specifically excluded assets.

By employing a two-step analysis of the APA's definitions of "Purchased Assets" and "Excluded Assets," the Defendants argue, to the contrary, that the parties intended all or substantially all of the Sellers' assets to fall within the rubric "used in the Business." First, they contend that the placement of the parenthetical in the phrase "used in the Business *(other than Excluded Assets)*" in APA § 2.1 (emphasis added) means that *all* of the Excluded Assets are "used in the Business." In step two, they assert that certain categories on the list of specifically Excluded Assets in APA §§ 2.2(a)-(k) are not the types of assets that one would readily describe as being used in a business,[5] which, the

---

[5] For example, the parties agreed that the Excluded Assets include certain tax refunds and abatements, APA § 2.2(g), and any avoidance actions of the Debtors' chapter 11 estates other than such causes of action that

8

Defendants contend, establishes, in the light of the first step of their analysis, that the parties intended "used in the Business" to be read extremely broadly.

The first step of the Defendants' argument is flawed, however. It would perhaps be persuasive if the parenthetical phrase in section 2.1 were "used in the Business (other than [*the*] Excluded Assets)," but, because of the missing "the," the parenthetical phrase is properly read to mean that the parties recognized only that *some*, *but not all*, of the Excluded Assets may be "used in the Business." That is, the term "Excluded Assets" serves two purposes: (1) to specify excluded assets that need to be so specified because they would otherwise be Purchased Assets because they are used in the Business, and (2) to specify types of assets expressly included in the Excluded Assets just as APA §§ 2.1(a)-(p) lists categories of assets specifically included in the Purchased Assets. *See Execulines*, 826 P.2d at 1336 (noting that the parties' omission of the unexpected credit from their list of specifically excluded assets does not automatically lead to the conclusion that they intended the credit to be a purchased asset, in the light of their general definition of the purchased assets as being those used in the seller's business).

Thus the Defendants' acknowledgement that certain of the specifically Excluded Assets in APA §§ 2.2(a)-(k) normally are not recognized as being used in a business actually corroborates that the restitution rights (which resemble certain assets listed in APA §§ 2.2(a)-(k))[6] also would not be used in the Business, and, therefore, were not intended to be included in the "Purchased Assets."

---

may exist against vendors, suppliers, or customers of the Sellers, which causes of action are Purchased Assets. APA § 2.2(j).

[6] See footnote 5, supra.

Noting that the APA defines the "Business" as "the business of Sellers *including*[7] the manufacturing and marketing of nutritional products" (emphasis added), the Defendants also argue that the parties' definition of the "Business" by its terms is not limited solely to the manufacturing and marketing of nutritional products. This, however, begs the question of how the insurance brokers' agreements to pay restitution could be said to be "used in the [Sellers'] Business." In response, the Defendants suggest that, because they have retained or might retain the services of the insurance brokers after the APA's closing, the restitution payments might affect their business relationships with the brokers. This is a considerable stretch, however. The restitution payments result from agreements between the brokers and the New York Attorney General; the Debtors did not even bring or, apparently, participate in the litigation that gave rise to the brokers' settlements. Nor was there any suggestion that the payments would render the brokers unable to provide future services. Indeed, there was no evidence offered that the payments would adversely affect the Purchasers' ongoing relationships with the brokers.

There does not appear to be a genuine issue then: as with the "demutualization" refunds in *Janowick* and the billing credit in *Execulines*, the Debtors' pre-closing contingent rights to restitution were not used in or even related to the Business except in the most general way that any other thing of value might be said to be used in a business, money being fungible, which interpretation, as noted above, is inconsistent with the APA's repeated emphasis on the Purchased Assets being "used in the Business." Compare *Bush Homes, Inc. v. Franklin Nat'l. Bank*, 24 A.D.2d 1012, 266 N.Y.S.2d 89 (2d Dep't. 1965), in which, unlike here, the dispute over the definition of the purchased assets was not between the parties to the agreement and, therefore, the court

---

[7] See footnote 3, supra, regarding APA § 1.3's construction of "including."

10

found it permissible and appropriate to consider parol evidence whether the parties intended to include or exclude the asset. 24 A.D.2d at 1013.[8]

Finally, the Defendants contended at the hearing and in a post-hearing submission that certain provisions of the APA, by using the phrase "relating to" (which can be viewed as a broad modifier, at least one that is more broad than "arising out of" or "solely related to," *see, e.g., Coregis Ins. Co. v. Am Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001); *Vermont Pure Holdings, Ltd. v. Descartes Sys. Group, Inc.*, 140 F. Supp. 2d 331, 334 (D. Vt. 2001)), stretch the definition of "Purchased Assets" enough to fit their purposes. The Defendants point to APA § 8.9, which provides that if the Sellers receive any money "*relating to* or as proceeds of the Purchased Assets . . . such Person shall receive all such items in trust for . . . and shall remit the same . . . in kind to Purchasers." (Emphasis added.) They also point out that APA § 2.1(p) lists as a Purchased Asset "any rights, claims or causes of action of Sellers against third parties *relating to* the Business. . . ." (Emphasis added.)

The Debtors were in part responsible for this line of reasoning, having made a similar argument themselves. That is, the Debtors, also urging a broad construction of the phrase "relating to," contend that the final clause of APA § 2.1(p) (which states that the Purchased Assets include claims or causes of action of Sellers against third parties relating to the Business . . . [but] *excluding those related to* the

---

[8] In *Bush*, the parties defined the purchased assets as including "all" of the sellers' "causes in action . . . and all other assets tangible and intangible, if any, used . . . in the business," of "wholesale lumber distribution and the manufacture and erection and construction of prefabricated buildings." 24 A.D.2d at 1013. Although this language could be read as transferring *all* causes of action (the "used in the business" clause modifying only the reference to "and all other assets"), and, moreover, although the cause of action at issue apparently was directly related to the business (at least the dissent made these two observations, *id*.), the court denied a motion for summary judgment on the basis of parol evidence that the parties intended to exclude the particular cause of action from the purchased assets. *Id*.

11

Excluded Assets . . ." (emphasis added)) when read in conjunction with APA § 2.2(i) (which provides that "all insurance policies" are Excluded Assets) means that the restitution rights (arising ultimately from the brokers' alleged bid rigging when with the Debtors were trying to buy insurance policies) was specifically excluded from the Purchased Assets as a cause of action[9] "related to" the specifically excluded insurance policies.[10]

        The Debtors correctly observe that something may be "related to" more than one thing.  As between the Defendants' and the Debtors' arguments, moreover, the Debtors' "related-to" reference in the APA more specifically addresses the Sellers' rights against the brokers.  Moreover, the Debtors purchased the insurance policies and are entitled to retain their benefits post-closing (APA § 2.2(i)); therefore, it may be argued, as the *Janowick* court did in an analogous situation, 2005 U.S. Dist. LEXIS 16728 at 9-10, that the parties intended the Debtors, who assumed responsibility for the policies and were entitled to retain their benefits, also to retain their rights against the brokers for improperly charging them when they were obtaining the policies.  On the other hand, the "relatedness" in the provisions highlighted by the Defendants is more remote, ultimately circling back to the limitation of "used in the Business" other than as an "Excluded Asset."  And as noted above, the restitution rights are "related" to the Business only to the extent that they are something of value that may, like any other asset that is convertible into money, be used in the business, a connection that is too tangential to support the treatment of the restitution rights as a Purchased Asset.

---

[9] See APA § 2.1(p).
[10] The Defendants correctly note that, at best for the Sellers, the restitution rights *only* "relate" to the insurance policies and their proceeds.  Such claims are not insurance "proceeds" in and of themselves. *Reymet Federal Credit Union v. Jones* (*In re Jones*), 19 B.R. 293, 295 (Bankr. E.D. Va. 1982).

12

## **Conclusion**

For the foregoing reasons, the Debtors' rights to be paid restitution by the brokers were not Purchased Assets under the APA. The Debtors' motion for summary judgment, therefore, is granted, and the Defendants' motion for summary judgment is denied.

It is SO ORDERED.

Dated: New York, New York
February 8, 2006

    /s/Robert D. Drain
United States Bankruptcy Judge